At this time, we'll hear In re Lehman Brothers Holdings. Good morning, Your Honor, may it please the Court, Richard Shager for the Adler Plaintiffs in 1296 with Andrew Goldenberg on the brief. The Adler group consists of the majority of the appellants here today, and I think we're presenting the core argument. I want to start by... Can you orient... I'm over here. Sorry. Can you just orient me, since it's a long argument, orient me a little bit. There's one major argument is under Section 510B, right? That's correct, Your Honor. And the other one is Section 10116, is that right? That's correct, Your Honor. Supposing that you were not to prevail on the second one of those, 10116, you were to lose on that issue. Is there anything left of the case? I mean, do you still have anything left to get from 510B if you lose under 10116? If 10116 was found to apply, Your Honor, I think, yes, it's an either-or proposition. That would be the end of the case. There's nothing left under 510B. You've got to win both of them. That's correct, Your Honor. Just a quick summary, if I may, about what the case is all about, just to orient us. As you're right, Judge Sack, a very long argument. What happened here is that employees had compensation that was declared, and Lehman unilaterally withheld a portion of it under a deferred compensation plan. Right? Okay. Unilaterally, but it was pursuant to a contract? I mean, these ... The documents are clear, Your Honor. That Lehman declared compensation, and then unilaterally decided what portion of that compensation would be withheld. They knew that ... The employees knew that going in. I mean, it wasn't just sprung on them, or was it? In most of the contracts at issue here, yes, Your Honor. The employees did know that some portion of their compensation might be reserved. All right. That's correct. Some. On the other, are you referring to the Neuberger and Berman case? No, I am not, Your Honor. I am referring to some employees who were hired by Lehman before the plan came into effect, including several of the witnesses here. Nonetheless, were treated under the plan. That's correct, Your Honor. Okay. If the employees stayed with Lehman for five years, then they would be given some portion of ... They would be given stock or cash in Lehman's option in payment of that deferred compensation. At the petition date here, though, none of that deferred compensation had been paid. Lehman recognized in its petition that the amounts withheld were due to the employees as contract compensation. Lehman listed that compensation in its petition under Schedule G. Nothing to do with the stock that was promised five years down the line, Your Honor. It was the compensation that was withheld, which is what the case is about. Unlike MedDiversified, on the petition date, there was no binding obligation to issue shares. There was no binding obligation to pay anything that would have been due in five years. But Lehman recognized in its petition that the monies that had been withheld from the declared bonuses were due to the employees. It told the employees to file claims. We, Lehman said, we've listed that compensation on our schedule as due to you. We will even help you fill out your claim forms. But it was the claim form for the compensation that had been withheld. What distinguishes the case from MedDiversified, I think, Your Honor, is that there was no binding obligation on the petition date to deliver any kind of security. That's not the issue. The issue presented is whether the employee's interest in that withheld compensation was a security under an 80-year-old definition of security that Congress carefully incorporated into the Bankruptcy Code, and in that circumstance, whether it should be subordinated. That's the central issue to start with. The Court's below subordinated. We believe in a seriously misreading of the so-called rule of broad interpretation that was developed by this Court in the MedDiversified case. There is not a court, Your Honor, in the country that has subordinated compensation claims under 510B the way the Court's did below here. I think it might be useful to—I think we've covered the MedDiversified case, but I'd like to draw attention to one particular aspect of it that I think is important for the analysis here, and that's this. MedDiversified was found on the petition date to have a binding obligation to issue shares. That's what the claimants sued on. And this Court, interpreting the phrase arising out of the purchase or sale of a security, said this phrase should be interpreted broadly in order to give effect to the statute. I'm sorry, Your Honor, the yellow lights seem to come on awfully quickly. That's not the case here. There's no binding obligation to issue the shares here. It was not a voluntary plan. In Oozleton, the Tenth Circuit case, the binding obligation—the voluntary plan was defined as one that permits employees to elect whether to participate. In this case, there was no election. In the Oozleton phrasing, you're already an employee. Yes, you elected to come to work, but you did not elect to participate in the plan and the employees did not elect to that— You elect to work for a particular employer whose compensation arrangement, by virtue of this stock plan, could be considerably more rich and rewarding than getting a flat salary someplace else. Yes, Your Honor, but that's not really what the point of the case is. I'd like the Court to think about a case in the D.C. Circuit called Foltz. It's a useful case analytically because it presented two types of plans. One was found to involve the purchase or sale of a security, and one was found not to involve the purchase or sale of a security. Coming to work is not the election. That comes right out of the Daniel decision from the Supreme Court. Coming to work, you come to work to earn a livelihood. And Paul Shotton, one of the witnesses, was very clear about that. He didn't move to the United States to invest in security. He moved to the United States to make a living. Daniel was looking at the meaning of security in the context of the Securities Act and the Exchange Act. We are looking at a very different context for the meaning of security in the context of a bankruptcy in which we're looking at the relative rights of creditors. I see many reasons that one might apply a different definition, and in fact, the statute itself, as Judge Sack is kind of alluding to, doesn't just refer to the Securities Act or the Exchange Act for definitions of securities. It looks to its own definitions and has different policy reasons for construing it one way or another. Why is Daniel so important in this context? Because Congress, in incorporating that definition of security, specifically traced it back to the Exchange Act. And we know from Landreth, among many other cases that— It's a starting point, but this is a very different context. Don't you agree? Well, okay. Well, then let's take one instance of that different context, Your Honor, and that's the definition of investment contract, which is really a logical place to consider something called an RSU agreement. And Congress did change the definition of security in the investment contract provision by way of saying, if this investment contract is not required to be registered under the Securities Act, then we will not consider it a security under the Bankruptcy Code. That's an illustration, I think, Your Honor, of what you're saying. And that is, yes, there were differences. Congress also added security of an affiliate. It gave careful definition to security. And we know from other litigation before this Court that a security of affiliate presented an issue that would not have come up under the Exchange Act. That's correct. But Congress consciously adopted a definition because it had a legal meaning. And Congress drew the legislative history right back to the Exchange Act, and that definition was carefully incorporated into the Bankruptcy Code. It had also been in SIPA, and Congress was conscious about tracking SIPA, the SIPA definition in the Exchange Act, because it wanted the same legal pattern to be established here. And the particular concern there was broker liquidations, because some brokers are covered by SIPA and other brokers are not, and Congress wanted the resolution to be the same. But it was the same definition, and Congress indicated its intent to track through the legislative pattern. We'll hear you on rebuttals. Thank you, Your Honor. Morning. Morning, Your Honors. Lisa Solomon on behalf of the Antonsec, Andriola, and Cone Groups. In response to the question— Could you adjust the microphone so it's— Of course, Your Honor. Thank you. That's helpful. Is that a little better? In response to the question that was raised earlier, whether the determination of whether an RSU is in equity security is determinative of all the issues in this case, the response to that answer is no, because claimants are asserting two bases for denial of subordination and allowance of their claims as general unsecured claims, and one of them is the alternative performance doctrine. And the alternative performance doctrine is premised upon claims that the claimants had as of the bankruptcy filing date and not based upon the RSUs. Therefore, if an RSU is a security or an equity security or not, does not dispose of the alternative performance claims— What is that claim that does not arise from the security? It arises from the employment contract. At the outset of the employment relationship, Lehman made a promise to its employees. It made, in fact, alternative promises. It told its employees that it agreed to pay and it promised to pay their total compensation in cash, while at the same time it reserved the discretion and the option that it might pay a portion of their total compensation through the equity award program that would result ultimately in the payment of their compensation through the device of LBHI common stock. Which is here. It says, in no event shall a company become obligated to pay cash in respect of such obligation. That's correct, Your Honor, and two issues arise with regard to that. I assume you're reading from the RSU documents themselves. I'm reading from my notes, frankly. That's fine, Your Honor. That was with regard to the RSUs themselves, but we submit that the evidence that was before the bankruptcy court did not establish that the claim that claimants had that arose prior to the bankruptcy was not discharged upon the immediate issuance of the RSUs. There was a claim, and that arose at the time of possibly the earliest time of the employment contract. Let's take a hypothetical. Let's say somebody goes to work, supposed to make $100,000 a year, $50,000 of it is allocated in terms of RSUs, and then five years later, they get those RSUs and they pay them, and it's only $30,000. Do they have a claim for $20,000? But that's a different situation than the situation here, where Lehman retained the discretion to decide whether it was going to issue RSUs or not. What's the answer to my question? If they only got stock at the current market price was worth less than the $50,000 of foregone income, would they have a claim? It would depend whether they had released all other rights with regard to a claim that otherwise arose at the time that they rendered their services or at the time of the employment contract. Lehman was careful in its documents, but one thing that it did not provide for in all of the employment documents was that the issuance of the RSUs was an immediate discharge and or a release of all claims that the claimants had and the employees had for, on account the rendition of the services, and it could have easily included that in the documents, but it did not do so. I'm not sure I understand why that is any stronger, an argument here in bankruptcy where you get nothing, than it would be in my hypothetical of somebody who follows all the way through. Five years later, they get $50,000 of stock that they took in lieu of $50,000 in income and it's only worth $30,000. The difference, Your Honor, I believe is that at the outset, if you restrict only your rights and your remedies to the stock that you'll get, then it's understandable that would be the outcome. But in this situation, the claimants didn't, Lehman didn't restrict its options. Lehman didn't tell the claimants on day one, as was the case in the Enron case, that this is the arrangement. You're going to get RSUs as a portion of your compensation. I thought you were going to say that in my hypothetical, Lehman performed by giving the stock, whereas in this situation, Lehman breached. Lehman was not required to- Your clients don't have the, they don't have the stock and they don't have the money. That's correct, and they rendered the services. And so that's distinctly different. And Lehman was the one who retained the discretion to pay in the common stock. And it's our position that it was not the discretion to pay in an RSU that was merely a promise to pay in the future. In addition, Your Honor, we believe that that discretion was even retained beyond the date that the RSU was issued. The incentive plan, which is controlling over any of the other documents, the 2005 in particular incentive plan provided that Lehman may pay in cash in various circumstances. And in 05, it expanded the universe of circumstances where it could pay in cash, even after it issued the RSUs, and those circumstances included where required by applicable law. And where required by regulation, and where required by local practice. And we think that those situations either apply here, or if nothing else, create ambiguities by virtue of the fact that Lehman continuously and repetitively retained discretion in its favor, and it wanted to retain that flexibility. And if there are any ambiguities with regard to the interpretation of the contracts in this situation, we think clearly that it should be construed against Lehman as the drafter of its own documents. Particularly when the plan was a broad based plan that was not limited only to the highly paid, but include the rank and file employees. How does your position, just in general, how does your position or your clients differ from the Adler plaintiff's position? We are relying upon the alternative performance doctrine, and we are also relying upon a policy analysis, which we think is applicable in this situation. Would it apply to the Adler plaintiffs also? If their claims are similar to our claims, which I believe that they do, although they could more appropriately address that, but I do not believe that there are differences. I want to be sure I know who's arguing for whom and how you differ. That's understandable. I think that the main difference is that they're relying upon different legal theories at the Adler group, that is. The same place from the same place. That is correct, Your Honor. Thank you. You've reserved rebuttal. Thank you. I believe, yes. We've got one more coming. Yes, that's a quite a lot. My name is Debra Lanz, and I am here representing the Neuberger-Berman claimants, but no, I'd like to be the same. The issue that I would like to address, I believe, is equally applicable to all of the claimants. Because what I'd like to talk about is the question that each of you asked at some point earlier, which is, in effect, didn't these claimants purchase securities when they came to work at Lehman? And I think in one way or another, each of you has asked that. And my answer to that question would be no, they did not. And they did not because in no case did they do anything more than come to work. They made no investment decisions at any point along the way. So in the securities context, in the Daniels case and in the cases that have followed it, it is clear that where an employee is simply a participant in a mandatory, non-contributory plan, so the employee cannot opt in or out, they're simply in the plan. And they cannot say how much, if any, of their compensation will be dedicated to whatever the form of equity is. And the cases concern options, they concern restricted stock, deferred stock. And there are SEC no action letters that include a letter to Goldman Sachs about a plan that it proposed, which involved deferring compensation into RSUs that was, in every material respect, the same as the Lehman plan. In each of those situations, the decision is, there has been no purchase, and remember, purchase is an element of section 510B. There's been no purchase because the employee did not have any opportunity to make an investment decision. To your question, well, aren't we in a different context here? I would say we're not. Yes, the securities laws are not the bankruptcy laws. Obviously, I understand that. But the specific question that's being answered under 510B and under the securities laws is, has this individual who is making a claim made an investment decision such that he or she is then bound by it? So- Why wasn't it an investment decision such that their claim now arises from the purchase of a security to have entered into this employment agreement that gave the employer the discretion to pay substantial portions in stock, which gave your clients and the plaintiffs the substantial upside, as it turned out, for most of from the 1994 through 907, for example. To continue to vest and to see that portion of their compensation gain in value, perhaps well beyond what they ever imagined they would earn. They had that upside, now they have this downside. Why is that not an investment decision? Well, here they don't have that downside. Here they never got the stock. So that's a distinction, but that's not my principal answer. My principal answer is twofold. Number one, because the Supreme Court in the Daniel case said that by going to work, you're not making an investment. You're going to work and earning a livelihood. And it seems to me that that principle applies equally well to people who go to work at securities firms or other organizations where deferred compensation in some form of equity is part of the bargain. If they don't have a choice, remember here, unlike in Enron, unlike in other cases, these employees cannot say, yes, I want to participate in a plan which allows me to defer compensation into equity. The only decision they make is to come to work. They made that decision in accepting the package to begin with, correct? There's no question about that. But what is clear is that under Daniel and the line of decisions that follow it, and the SEC no action letters, that's not an investment decision. That's a decision about employment, and those are separable things. And the cases that are there on the security side, at least, are clear that by saying, yes, I'm going to work at this place, you are not therefore making an investment decision. You're making a range of decisions, quite obviously, about the future of your career, about the type of work you want to do, not a pure investment choice. Let me ask you a hypothetical. Let's say a person goes to work at a company that pays more than minimum wage, but pays part of the income in stock, delivered right then, every two weeks. Pay package and stock. And let's say that there's a claim that that stock was manipulated, and that the value of it was overstated. You're saying that that is not a claim. And that's what the case says. That would be in connection with the purchase or sale of the security, because the employee never purchased the security, it just participated in this. You're precisely right, and that is what the cases say. It is odd, but that is what all of the cases say that arise under the securities laws. What they say is that individual, I'm assuming the plan is mandatory, they don't make a choice. You're saying that even though the person has shares of stock, and has shares in equity, and sues, claiming that it was manipulated, and gets a judgment, that that judgment would be treated as an ordinary claim under the bankruptcy laws, and would not be subordinated under 510. I think that's what you have to be arguing. Well, you took your hypothetical one step further. Give me a minute to think. So- You don't know how many you've got, right? No thought permitted. The problem, I think, with the hypothetical, Your Honor, is that that individual couldn't sustain that claim. They would be dismissed for lack of standing under the body of law that is out there in the Send-In case, and in a number of cases in the district court here, all of which say, if you got your stock in a mandatory way, and you didn't say how much you wanted, like the Lehman plan here, then you have not made a purchase. And your claim doesn't arise in connection with the purchase. I understood your argument, which is made briefly, but interestingly, to be somewhat different. And that is not that none of this arises in the purchase of stock, but that what you're asserting is not a claim for rescission or for damages, but is a matter of simply of restitution, which has some distinct aspects to it, and is based upon work performed for which no compensation was ever given, because Lehman breached the duty to turn over the shares, even though they're not worth anything. Am I correct, or? It's an alternate argument, and we do make that argument, your honor. These people had compensation awarded to them on a formulaic basis. So every month and at the end of the year, it was a simple computation made. You brought X amount of revenue to the firm, you're entitled to Y amount of compensation. And they got part of it, and they didn't get part of it. Hypothetically, suppose that in the bankruptcy or before the bankruptcy, in the bankruptcy, Lehman had actually turned over the shares of stock, and they weren't worth anything. Would you have a claim for restitution? I would say no. I mean, I know that's anomalous, but it seems to me at that point, Lehman would have performed his contract, assuming- You're saying that Lehman breached this contract, and therefore- It prevented- Is stuck with, or is vulnerable, then, to a claim of restitution. Yes, I don't think it's stuck. They're going to pay for what they got. You know, they made a bargain. They said, if you come in here and you bring in X dollars of revenue, we will give you Y dollars of compensation. They prevented the full performance of that contract by filing in bankruptcy. Yes, I think that the claimants are entitled to restitution. So your argument is you're not under 510 at all? In that case, that's right. Because it's restitution. That's right. I think that's right. We have alternate arguments. Well, you've reserved a minute's rebuttal. We'll hear the other side. Thank you. I actually didn't reserve any rebuttal, but I'd be happy to take it if you want to give it to me. You have it. Thank you. May it please the court. I'm Ralph Miller from Wongotchlin Manges on behalf of Lehman Brothers Holdings, known as LBHI. The opinions below from Judge Chapman and Judge Sullivan are well-reasoned, thoughtful, and correct. They explain two independent and compelling reasons that appellants, all of whom received stock units or stock awards from a Lehman Brothers equity awards program, should have their monetary claims reclassified as equity interests. First, both courts correctly ruled that Section 510B of the Bankruptcy Code mandates reclassification of these claims as equity interests because they're all claims for damages or rescission from the purchase of LBHI securities. Alternatively, both courts below ruled that restricted stock units and continued stock awards are, quote, equity securities within the definition in Section 10116 of the Bankruptcy Code because, as Judge Sullivan put it, an RSU walks, talks, and squawks, like shares in LBHI. And it's not just the two courts below who have concluded that the Lehman Equity Awards Program made equity awards. Many thousands of holders of RSUs or CSAs did not file monetary claims at all. And in the bankruptcy, about 93% of those who did file monetary claims allowed their claims to be reclassified as equity interests on an uncontested basis by not responding to objections. Less than 100 Equity Award Program participants still maintain today that they should receive cash for their RSUs. What difference does that make? I mean, how does that persuade us of what? I mean, it's not a democracy in this sense. Well, I think it demonstrates that there was a clear understanding that what was being paid was an equity interest, that thousands and thousands of people recognized this as an equity interest, and a very small number, in fact, among the most sophisticated and best compensated, have carried it all the way to this court. And I want to clarify one thing that I think is very important. They're the ones who are here. Pardon me? They're the ones who are here. They are the ones who are here, and we want to address their issues. They had the most money involved, you just said. Well, that may be one reason, Your Honor. They are also among the most sophisticated. One of the things I want to make clear, and I want to talk a little bit about this whole confusion over alternate performance, is that what has happened is that in the bankruptcy, in effect, these claimants have received stock. What there is of stock, they have received. The RSUs had two requirements for vesting. They had what was called a tenure requirement and what was called a loyalty requirement. Basically, over a period of two years, either four years or five years, after the RSUs or CSAs, and I'm going to use RSUs because that's what the courts use. The only difference is whether they were in the U.S. or internationally. The RSUs and the CSAs turned automatically into common stock, the LBHI, after five years. If the employees kept working there, that was the tenure. And if they didn't, engage in certain disparaging or improper conduct. And that was. They simply expired and went away. They expired if they left. But if they stayed and they didn't go to work for a competitor at night or disparage the company, the loyalty, they automatically turned into RSUs. They couldn't be turned in for cash. There was no choice. There was no election. It was automatic. And that's what has happened here. Now, it's true. What do you say to the observation that whatever it is they had, however you describe it, they didn't get? They did get it. And they still have it now. And let me explain that to you. You said you were going to explain that, but I lost the train. Yes. Well, what I was going to say is there were these two requirements, the loyalty and the tenure requirements. The bankruptcy made it impossible for them to fulfill those loyalty and tenure requirements. So all of the participants have been treated as if they did fulfill those requirements. But isn't it also a breach? No, Your Honor. Because we mean not fulfilling the requirements. I'm sorry. I don't understand the question. You have a contract. You don't have to perform the contract in bankruptcy. But if you don't, then, you know, then the bankruptcy code has to work out what the consequences of that. I want to make this very clear. You have a right to breach, but you may have breached. The participants have stock. They have the same thing as common shareholders. They have the same interest. I'm not sure I understand that. Yes, let me explain that. When did they get it? They got it because what the order does is not to deny these claims, but to reclassify them as equity interests. So they still have on the books of the Lehman Estates the right to the same payment as if they had gotten all the shares of stock that they were supposed to get under the RSUs with their dividends. And when you say payment, you mean issuance or the conversion of the RSUs into stock? I mean if money should pour into the bankruptcy estate and fill up the bucket for general creditors and pay off any post-petition interest so there's money left for equity as there was, for example, in the American Airlines bankruptcy, they're going to get exactly the same equity as if they had stock certificates for their RSUs. It's going to get to them. Now we all know in this year of 2017, sometimes unexpected things do happen and it's possible that that will happen. But that's really, that's not the legal issue here because all that's happening is reclassification. They have stock. They get stock. How did the RSUs get to be stock? The order is, as you pointed out earlier, the bankruptcy made it impossible for them to fulfill the conditions under which the RSUs would become stock. Because the plan administrator determined, and this is in one of the stipulations we have, that there were no conditions for any of the participants that have been reclassified as stock that would keep them from receiving their stock, that we know of. The record on that? I'll get a site for you in just a moment. Yes. Well, the more important site, Your Honor, is to the order entered by Judge Chapman, which says these are reclassified as equity interests. It doesn't say they're denied. What it says is that all these people still have equity interests. And in bankruptcy terminology, an equity interest is not a claim. But all holders of equity interests come in and we have a whole procedure at the end of the bankruptcy if it turns out that it is solvent. And by the way, some Lehman subsidiaries are solvent. But the only Lehman entity that issued common stock is LBHI. So you have to act in the bankruptcy era. You have to assume it's always possible. It is always possible. And it's happened a number of times. Monies continue to come in into the Enron bankruptcy. And I think it may actually have become solvent many, many years later at some level, or almost solvent. In any event, these people have stock. That was just a confusion that was being presented to the court. They have the equity interests as if they had fulfilled their conditions, the company had continued to function, they got it. It so happens that they can't sell that stock because there's no market for it. It doesn't exist in any form. It only exists as a claim. And I don't use that in the bankruptcy sense. Let's say it's a bank, it's an accounting entry in the computer systems that keeps track. They can't transfer it, no. But neither can other holders of common stock. I'm sorry, I hate to get into this, but it's really true that there's actually only one share of stock left. And all interests are combined into it under the plan administration. I'm not sure I want to hear about that. Okay. Anyway, in any event, but they have their interest in the golden share, as it's sometimes called, just like everybody else does who had common stock. The interest is not transferable. But neither are other stock interests in it, to my knowledge. I mean, maybe they are. In any event, that's never been raised before. Then the question becomes whether the transmutation of the RSUs into stock was simply done unilaterally by the trustee by forgiving the conditions that the bankruptcy had rendered impossible. Well, whether it's unilateral or not. If the trustee rendered them impossible, then the other way to look at this is, arguably, that they were still left with the RSUs, but they never got the stock as a result of it. And they did the work, and the work, and they're seeking restitution. And 510 doesn't speak in terms of restitution. Well, I believe it does, Your Honor. If you look at what was said in the district court opinion, and I think Judge Sullivan put it well when he said, even if appellants could make a, in this case, he was talking about an economic duress argument for their RSUs, that would not take their claims out of the scope of 510B, since the claims would simply be considered claims arising from rescission of a purchase of the debtors, security of the debtor, and thus would be subject to mandatory subordination. And he quotes from a case that notes that a play for restitution is merely the remedial flip side of a rescission claim. But in any event, whatever claim it chooses to call it, its rights depend on its purchase of the debtor's stock, and therefore arise from that purchase, such that the right to relief is necessarily subordinated. If you go back to the Slane and Kripke article, which is the source of 510B, what Professor Slane and Kripke said, and it made perfect sense, is, look, if people have stock in a bankruptcy, they have to get in line behind everybody else. And there are a lot of people who either didn't get stock or claimed that they should have had more stock, or they claimed that they were deceived about their stock or something else. And they shouldn't get any more than if they had, in fact, gotten the stock. So if people- These broad variety fraud claims, they're not claiming they were deceived about the stock, as I understand it. And that's the thrust of the Kripke article, that people cannot transmute base lead into gold by saying that my claim for fraud in a stock transaction now should be treated as a claim along with people who had value other than the shares. Your Honor, you're absolutely right. But as Judge Chapman pointed out, fraud is a much more serious violation of law, its intentional misconduct, as opposed to what happened here, which was nothing except the unfortunate play out of exactly the deal these parties made. They all understood, within the policy decisions and the MedDiversified decision, which Judge Sack is well aware of, that the court pointed out that the primary purpose of 510B is to make sure that those who assume the position of shareholders and got the rewards of shareholders, or were seeking to assume that position, or tried to get that position, did not get in line ahead of the general creditors who were working without the knowledge and without that choice. That's the whole bankruptcy system. And so, in terms of the alternate performance and 510B and all that, it's being played out correctly here because these parties are getting exactly what they bargained for. They bargained for whatever the upside or downside potential was in the future of LBHI. And if LBHI had been in the slot where Goldman Sachs was, or where AIG was, or where Bank of America was, and they'd been bought out, these people would have gotten large fortunes for their RSUs. As it turned out, that wasn't the way the deal they made worked out. They still are in line for whatever they're going to get. They've gotten the alternate performance. Is there actually a way to value the RSUs that would be payable? I mean, one of the things that struck me about the difference between these claimants and your standard creditor is that there is a some certain that is due, whereas here, the RSUs were issued at a particular time, varied over time, both after the vesting date, if they were held on to, as well as before. And it's difficult to know, other than maybe hearkening back to what the stated compensation was at the time of issuance. But that doesn't take any account of the variability that was expected. In fact, the increase in value that was expected by all parties. There's absolutely no way to value the RSUs, you're right, Your Honour, except to give them a value which is very close to zero. If you looked at the stock price of Lehman stock, for example, on the morning of September the 15th, 2008, when it filed, the stock price was virtually at zero. And all of these participants had not completed the process. They were all unvested RSUs. And I want to make it... Were any vested that had been held on to, that had converted into stock, or those are separate? Of course, those are stockholders. These people are exactly in the same position as those people. Each RSU turned into one share of stock. The RSU grew with dividends over the vesting period, just like stock did. If there was a dividend declared on common stock, then the value of that dividend was applied to their RSUs and they were bought additional RSUs, fractional RSUs. So when they came in, so let's say they got 500 RSUs and there were dividends equivalent to, say, 30 over the five years. They got the equivalent of 530... They got 530 shares of common stock and LBHI on the so-called vesting date. Boom. And it was automatic. RSUs were like caterpillars turning into butterflies. A caterpillar doesn't have a choice as to whether it becomes a butterfly or not. If it survives, it becomes a butterfly. And the RSU claimants and the RSU documents and the plan didn't have any provision for anybody to opt to be cash. They couldn't stay a caterpillar. And just like a caterpillar can't turn into a honeybee, they couldn't turn their stock into apple stock or anything else. The only trick that an RSU did was it was unrestricted stock that became... It was restricted stock, excuse me, that became unrestricted stock. That's all that happened. I assume that some or all of these claims before us today could be characterised in restitution terms. Are there any cases that subordinate claims that are styled either as restitution or a breach of contract that's not actually related to a fraud or to some fixed amount of money that's not in any way tied to the value of a stock? Yes, Your Honour. There are a number of cases that say that. In fact, the one that was being quoted by district court is Style Site Marketing, which is a bankruptcy court case that points out that... which is a restitution plea that said restitution is merely the remedial flipside of rescission. And this is what Judge Chapman called a cul-de-sac, and that is that essentially whatever they call their claims, because the only thing they were doing was engaging in sort of a long-term purchase of common stock, all they can ever turn into is the best that it could have been, which is common stock. They can't say, Oh, I didn't want common stock, I wanted cash. It was never going to be cash. And I do want to address a couple of the points that were made about the whole securities law confusion here, and I think, Judge Carney, you exactly put your finger on it, that securities laws are completely different. Their purpose has to do with disclosure. And the Daniel case is a good example, International Brotherhood of Teamsters v. Daniel. It was a disclosure case about whether somebody who was not properly informed that he had to have continuous employment would get interest in a non-contributory pension plan, which was one that the union had basically set up, and the employer just paid some money in. And Judge Powell's opinion, first of all, finds that it's not covered by security laws because ERISA had replaced it. So the reason that non-contributory pension plans today are not considered securities is largely because of ERISA. But more importantly, as he pointed out, and this is true of most non-contributory pension plans with regard to the issue of sale or purchase, he said there was no fixed relationship between contributions to the fund and an employee's potential benefits. He said that if they worked there for 20 years, they got a fixed benefit even the same as if people worked there 40 years, and there was no individual contribution. The employer just set up the plan and it paid. Was there a stock element to it? No, there was nothing about stock at all in it. They were trying to claim that a pension plan was a security for securities regulation for disclosure purposes. That has nothing to do with the bankruptcy principle of absolute priority, which is that there are certain rules about which creditors take the limited funds in a bankruptcy. And the people who were trade creditors, they sold Lehman paper computers. They didn't invest in Lehman. They are in line and should be in line for whatever cash can come out of Lehman ahead of equity, ahead of the people who had upside as well as downside. And that's what the Slade and Kripke article said. It said that the people who had taken on the risks and had assumed and had the benefits of shareholders should be classified like shareholders, and that's what 510B does. And that's also what happens when somebody gets something that is like stock but not quite stock. It's treated like stock. Why doesn't the fact that they had labored, that they had an employment contract, put them someplace above your standard stockholder that made more of an orthodox investment decision? It did for the portion of their contract that was payable as cash. There is a small benefit, actually a priority as I understand it, for a portion of wages. It's a limited amount. And after that, the rest of the wages for cash would be paid and would have been paid generally with other general creditors. But if they were going to get payment in stock, if they had stock, then that is always in equity. And the reason for some of them, very large portions of their compensation, maybe 65 percent were supposed to be payable in this discretionary way. Well, I don't think there's any concern. It's a good question. But if you look at the numbers that are shown, in most cases that was on top of a million dollars or on top of many hundreds of thousands of dollars. They were already highly paid. And the testimony in trial, remember, in terms of your review, there's a lot of fact argument here. These are all facts that were presented in various forms to Judge Chapman and rejected. After three days of hearing with six witnesses, who were all participants, by the way, and lots of documentary evidence, and she just found that these people made voluntary choices and that they did what they did because they had very rich compensation packages. Is that a finding to which we owe deference? Because it sounds like it's an issue of law. I mean, they did what they did, and there's nothing that... There's a lot of findings. I'm sorry. Is it a finding that they did this voluntarily? Oh, yes, absolutely. But that's only based upon the objective facts that they accepted employment in a place that compensated people in this fashion. Judge Chapman expressly found, despite the RSU's claim it's assertion to the contrary, the court finds their participation in the program was entirely voluntary and that they thereby purchased the RSUs in exchange for their labour. She...she...she... There's a lot of quotes. Ms. Fleischman testified that she had to balance against what she would be giving up, which was five years of deferred compensation, but she could go somewhere else. That wasn't quite so with respect to the Neuberger defendants. It's a point with respect to all the defendants. Judge Chapman made a... There are two good quotes in Judge Chapman's opinion, starting on pages 20 and 21, about this. She says, at all relevant times, the RSU claimants understood they'd be compensated both with cash and the right to become holders of common stock and that they voluntarily and continuously accepted as a condition of their employment that part of their total compensation was to be paid in RSUs. They could have voted with their feet. She also quotes from the Enron decision where the judge made the... Judge Gonzales made the point that if the claimants were to receive a portion of their compensation as options, in that case, that was a condition of employment they willingly accepted in return for their labour, they thus purchased... But what about the Neuberger... It's Neuberger, right, the claimants, who weren't part of Lehman at all and then found themselves pushed into Lehman? What choice did they have? They had the choice not to go into Lehman if they didn't want to. And many of them pointed out... Outstanding to non-competes, all this kind of pre-existing superstructure. But, again, Judge Chapman dealt with that. She found that the non-competes were all perfectly lawful. She found that the correct standard to test that would be duress. The VKK opinion makes... Yes, I know, from Judge Slack, makes it clear that there has to be prompt complaint of duress. There was no complaint for 10 years about this. And furthermore, there was no evidence that the restrictions were unlawful. When I cross-examined people, they agreed they had a lot of work that they could do. So I see that I am running out of time. I do urge the court to consider that this is a case that I think could very easily be affirmed with a procurium that says that the rulings of the bankruptcy court are affirmed for the reasons set forth in the well-reasoned opinions of that court and the district court. I think they're excellent opinions, and they tell you all you need to know. And it is important to understand that these are not denial. ...who didn't feel the same way you do. Well, I believe these are particularly thorough and particularly clear in dealing with this. And there was a lot of discovery allowed. These people had their day in court. They had a year of discovery, and they took depositions of Lehman. Is there a time constraint on our issuing a ruling in this case? Based on confirmation, performance, closing things down, whatever? There are distributions that are being made twice a year, and obviously, in theory, the sooner issues are resolved, then the sooner... We don't have any looming dates. No, I don't believe there are. I'll look to my bankruptcy partner here, Mr. Lehman, since I don't believe there are any looming dates. Thank you. Thank you. We'll hear Rebecca. Please, the court. I have a number of questions. How is your butterfly doing? I beg your pardon? Sorry? How is your butterfly doing? I hear you were going to have a caterpillar. I'm afraid, Your Honor, after five years, I don't see a lot of humor in the way people are treated in this case. I'm very surprised to hear that my clients are all these sophisticated, wealthy investors. You can look at Judge Chapman's order. Two-thirds of the claims that she reclassified are under $500,000. There are more people with claims under $100,000 than there are people with claims over $1 million, and this is not a laughing matter to them. It's dead serious. Okay? I can tell you that I plead with the court to distinguish between the hocus-pocus involved in an RSU and money that was withheld from compensation. That's the reality here. We're not talking about getting stock. We're not talking about getting the value of the services that were rendered, these negative services. What we're talking about is compensation that Lehman declared and never paid, and Lehman, by God, recognized that in his petition and told the people, you've got claims for your compensation. He told them to file claims. Pardon me? He told them to file claims. File proofs of claims, and not only you should, but we are, and you should file your proofs of claim consistent with what we say. In response to your question, Judge Jacobs, about what if he got paid with stock, well, that's a good distinction, and Daniel and the chain of cases following it recognize that. If you get something that has the identifiable characteristics of a security, then that's a big part of the element of a purchase or sale. They didn't get that here. They got nothing. They got a contract promise. But the RSUs, the RSUs did have characteristics that resembled equity. For one thing, they got dividends, which were true, were expressed in terms of additional RSUs. But the RSUs, and check me if I'm wrong, were backed by shares of stock that were deposited in the trust. Am I correct? You asked that question, Your Honor. A couple of factors to consider there. The RSUs were not transferable. They were not, you couldn't hijack anything. You couldn't borrow against them. Was there a trust that received a share of equity? I'm going to cite to the Landreth decision very briefly, because under Landreth, these were not securities. Under the five Landreth criteria, we fail three of them, particularly on the voting rights. There's nothing in the record about how voting rights existed, let alone what portion of a share, what portion of a vote an RSU got through this trust, because there's no information in the record about how many shares the RSU trust held. And the trust, we have no information in the record about how many shares were in the trust and whether the shares were backed up. I think the answer to your question, Your Honor, is very seriously no, that there is no record of a backup of these shares. They were created when the time came and laymen had the option to issue cash instead. Thank you. Oh, boy. We do have the briefs, and they are not short. So thank you, Your Honors. Your Honors, I want to clear up a couple of issues of confusion. The issue is whether there was payment here as of the bankruptcy filing on account of the RSUs or on account of any claims that the claimants had, and there was not payment. What Mr. Miller referred to as they received their alternative performance, he's referring to supposed stock that the claimants might be entitled to under the plan of reorganization as a result of the reclassification of the claims under the bankruptcy court's order. The reasoning that he is submitting is totally circular, because the question is whether the claimants have a claim in the first place or whether they just have a right to equity. These are not claims for fraud, and there was no vesting of the claims or of the RSUs prior to the bankruptcy. The record is very clear on that, that as of the bankruptcy filing, these were RSUs that were due to mature beginning, RSUs that were first issued in 2003 and subsequent years, and they all had five-year terms other than the RSUs that were issued in mid-July of 2008 that had three-year terms. So as of the bankruptcy filing, none of these RSUs had yet matured. The bankruptcy filing, as Your Honor recognized, rendered impossible performance on the RSUs, and the documentary evidence that counsel referred to that the bankruptcy court relied on, well, in fact, the bankruptcy court ignored the documentary evidence that showed that the claimants did not understand that they were going to be paid in Lehman Brothers Common Stock at the outset, because, in fact, all of the employment contracts and the employee guides of my clients, and I believe the others, were perfectly clear that Lehman retained the discretion, so they did not know on day one that they were going to be receiving payment in Lehman Brothers Common Stock. They didn't know how much? No, they did not know. They did not know. It wasn't just a question of how much, but whether they would receive payment in Lehman Brothers Common Stock. Lehman exercised its discretion to issue RSUs, which was an indication that it was going in the direction of Lehman Brothers Common Stock. What was the maximum percentage that could be paid in RSU? I believe it was 65 percent for the higher paid employees, a very substantial amount. But there is no precedent from this Court, certainly, to reclassify the claim of an employee for services rendered solely based upon their acceptance of employment, and that's what you're talking about here. The choice as to whether to issue the RSUs was always with Lehman, and if the claimants had bargained for the risks and rewards of a shareholder, they would not have left that choice up to Lehman. Even after the RSUs were issued, they still had discretion whether they were going to pay them in cash or not. And the Enron decision is immensely different from this case because in that case... But if they paid them in cash, would they pay the amount that had been earned and transmuted into RSUs, or would they pay them the value of the shares as accrued with dividends over the years? I believe, Your Honor, that it would have been based on the value of the shares. The Enron case is immensely different from this case because there, there was an understanding at the beginning of the outset of the employment that they were to be paid part of their compensation in stock options. Not the case here, not only stock options, but that Lehman had the option as to whether and how it was going to pay the compensation. I don't understand how that makes Enron different. Could you... You're saying that because Lehman retained the option to pay in cash, that it wasn't fair to expect also that they were going to use their discretion to pay in RSUs instead of cash? They had the right to exercise their discretion. There's no question as to that. But if somebody makes a bargain to purchase stock, they're not going to leave it up to the trader as to whether they're going to give them stock or they're going to give them something else. So in this case where the option was left up to Lehman, in the words of the Rombrow decision, did they bargain for the risks and rewards of a shareholder? We say no, they didn't bargain for those risks. While they understood that it might or might not occur, that's not a bargain for the risks and rewards of a shareholder. And in the Enron situation, Judge Gonzales subordinated the claims, not based on the act of acceptance of employment, but because in that case in the stock options, there was a choice. There was a choice by the option holders whether they were going to exercise those options, and they chose not to do so, and that choice did not exist in this case. Thank you. Thank you, Your Honors. Just to point that up for a moment, what this Court said in its MedDiversified decision about Enron I think shows you the distinction. Because what this Court said was that the Enron claimants made decisions. They had vested but unexercised options. So they could have exercised the options and obtained stock. They made investment choices not to do so, and therefore were in the position of a speculator or an investor. The difference here is our people couldn't exercise any choice to acquire stock. They simply were mandated participants in a plan, and they never got to the point of earning the stock because of Lehman's breach. Is that a clear distinction for you? It's a distinction. I hear your words. It's a distinction. I hear your words is never a good sign. Thank you. If I might just say one more thing. Recision is not the same as restitution. Restitution is an independent— It's not the flip side? Say again? It's not the flip side? It's not the flip side. It is an independent remedy for breach of contract, more akin for the value of what was earned, which I would say in this case is how Lehman itself quantified it in the statements that it provided to its employees periodically because they said this is your total comp. This is what we're giving you in cash. This is what we're deferring. And I think that it's some certain is the amount that Lehman designated as the deferred amount. And I would only just add that as to the Neuberger claimants, they were very differently positioned in making a decision as to whether or not to accept employment or rather reject it. No, we have that argument because they came to the company by a different route. Thank you. Okay. Thank you all. It was expertly argued, I must say, on all sides. We will reserve decision. The final case on calendar is Lawrence versus Lehman Brothers is also taken on submission. Thank you.